[No. 20687. *En Banc.* December 22, 1927.]

THE STATE OF WASHINGTON, *Respondent,* v. ISADORE R. EDELSTEIN, *Appellant.*[1] ·

[1] · CRIMINAL LAW (176)—CIRCUMSTANTIAL EVIDENCE—WEIGHT AND SUFFICIENCY. Circumstantial evidence may consist of matters which alone would be immaterial, where in connection with other evidence they may be helpful in discovering the truth.

[2] SAME (451)—APPEAL—REVIEW—HARMLESS ERROR—CONDUCT OF COUNSEL. In a prosecution for burglary it is not incurable error for the prosecutor, in his opening statement, to say that the evidence would show that the accused, when arrested (three years later),· had burglar's tools in his possession; and no prejudice resulted, where, at the time and also later, the court admonished the jury to disregard the statement and the evidence was excluded when offered; especially where the burglary, if committed, was without the use of ordinary burglar's tools.

[3] SAME (108)—EVIDENCE—PROOF OF OTHER CRIMES—RELEVANCY TO OFFENSE CHARGED. In a prosecution for burglary evidently committed by one skilled and having special ability in manipulating safe or combination locks, evidence of the skill and ability of the accused as a manipulator of such locks in connection with proof of his opportunity to commit the crime, is admissible, notwithstanding it tends to show that he had committed other similar burglaries.

[4] SAME (103)—EVIDENCE—RES GESTAE—OTHER OFFENSES. In a prosecution for burglary of a vault and safety boxes on one floor of an office building, evidence of the burglary of like vaults and safety boxes on other floors, all during the same week end, is admissible as showing the plan or system of the burglary charged.

[5] SAME (112)—EVIDENCE—PROOF AND EFFECT OF OTHER OFFENSES. In such a case, it is admissible to show that the front door of the building had been tampered with in such a manner as to prevent access to the building on the night or Sunday on which the burglary of the vaults was probably committed.

[6] SAME (450)—APPEAL—HARMLESS ERROR—EXAMINATION OF WITNESS. In a prosecution for a vault burglary in an office building, prejudicial error cannot be predicated upon allowing the

[1]Reported in 262 Pac. 622.

janitor to testify that a detective had told him he thought the accused committed the crime, where it was, in effect, but bringing out the whole of the conversation with the detective, introduced in a strenuous cross-examination to show that the detective had said it was an "in-side" job.

[7] SAME (94)—EVIDENCE—RELEVANCY—SUBSEQUENT INCRIMINATING CIRCUMSTANCES. Where accused, when arrested, attempted to bribe officers to let him go free with an offer of diamonds, the diamonds are admissible in evidence.

[8] SAME (98-1)—ALIBI—EVIDENCE TO REBUT. Upon the claim of an alibi, and an attempt to show that accused was in a distant city when the burglary was committed, it is not error to show the possibility of his being in both places by the aid of aeroplane transportation.

[9] SAME (146)—EVIDENCE—ADMISSIBILITY—PHOTOGRAPHS. Upon the claim of an alibi, and an attempt to show that accused was in a distant city when the burglary was committed, an enlarged photograph of his alleged signature upon a hotel register in such city is admissible, where it tends to show that it was written in a space from which a name had been erased.

[10] SAME (238)—TRIAL—ARGUMENT OF COUNSEL. Error cannot be assigned upon improper remarks of the prosecutor in addressing the jury, where no objection was made at the time or request to the court to interfere.

[11] SAME (460)—HABITUAL CRIMINALS—FELONY—BURGLARY IN ANOTHER STATE. Upon a conviction of being an habitual criminal, under Rem. Comp. Stat., § 2286, based in part on a conviction of burglary in another state upon which the accused was sentenced to the penitentiary in such state for two years, it must be presumed that burglary in such state was a felony; in view of Rem. Comp. Stat., § § 2253, 2578, making all burglaries of whatever degree a felony.

[12] SAME (460)—HABITUAL CRIMINALS—DEFENSES—PARDON. Upon a charge of being an habitual criminal, in that accused had twice before been convicted of a felony, it is unavailing and no defense to show that accused had received an unconditional pardon for one of his previous convictions.

[13] SAME (54, 460)—FORMER JEOPARDY—IDENTITY OF OFFENSES—HABITUAL CRIMINALS. The trial of an habitual criminal charge under our statutes is not unconstitutional as placing accused twice in jeopardy for the same offense, and he is not thereby deprived of liberty without due process of law, or denied the equal protection of the laws.

Appeal from a judgment of the superior court for Spokane county, Huneke, J., entered January 8, 1926, upon a trial and conviction of burglary. Affirmed.

*Turner, Nuzum & Nuzum, Groff & Davis*, and *Edward M. Connelly*, for appellant.

*Chas. W. Greenough, A. O. Colburn*, and *Ferd. J. Schaaf*, for respondent.

PARKER, J.—The defendant, Edelstein, was, by information filed by the prosecuting attorney for Spokane county on the 9th day of October, 1925, in the superior court for that county, charged with the crime of burglary in the second degree, as follows:

"That the said defendant, Isadore R. Edelstein, in the county of Spokane, state of Washington, on or about the 23rd day of July, 1922, then and there being, did then and there wilfully, unlawfully and feloniously, with intent to commit a crime therein, break and enter a certain room and structure, towit: a vault on the 9th floor of the Paulsen Building, said building located at the corner of Riverside avenue and Stevens street, in the city and county of Spokane, Washington, said vault then and there being a structure wherein property was kept for use and deposit: That said Isadore R. Edelstein, from and after the 23rd day of July, 1922, up to and including the 2nd day of October, 1925, was not usually and publicly resident within the state of Washington."

This concluding allegation was for the purpose of avoiding the barring of the prosecution, by lapse of time following the alleged commission of the crime. The defendant was arrested in San Francisco, and soon thereafter, on October 30, 1925, brought to Spokane, and, having been duly arraigned to answer to the charge of the information, pleaded not guilty. On December 9, 1925, his trial upon that charge was commenced in the superior court for Spokane county sitting with a jury, and resulted, on December 16, 1925,

in a verdict of guilty, as charged, being rendered against him. On January 2, 1926, the prosecuting attorney for Spokane county filed in the superior court for that county another information, supplemental to the former information, charging the defendant with being an habitual criminal, as follows:

"That the said defendant, Isadore R. Edelstein, alias J. R. Edelstine, on or about the 11th day of August, 1913, in the county of Greene, state of Missouri, in the criminal court of said county and state, in Cause No. 56770, under the name of J. R. Edelstine, was then and there duly and legally convicted of the crime of burglary, the same being a felony at that time, and at all times since, under the laws of the state of Washington. . . . That the said defendant, Isadore R. Edelstein, alias J. R. Edelstine, on or about the 4th day of January, 1919, in the county of King, state of Washington, in the superior court of said county and state, in Cause No. 9169, under the name of Isadore Edelstein, was then and there duly and legally convicted of the crime of burglary in the second degree, the same being a felony at that time, and at all times since, under the laws of the state of Washington. That the said defendant, Isadore R. Edelstein, alias J. R. Edelstine, on or about the 16th day of December, 1925, in the county of Spokane, state of Washington, in the superior court of said county and state, in Cause No. 9044, was duly and legally convicted of the crime of burglary in the second degree, the same being a felony at that time, and at all times since, under the laws of the state of Washington."

The conviction last so charged is the conviction by the verdict of the jury above noticed as the substantive conviction; judgment and sentence not then having been rendered thereon. Other prior convictions were charged in this supplemental information, but the prosecuting attorney elected to proceed only upon the two mentioned in the above quoted language thereof. There then followed unsuccessful efforts, by prohibition proceedings in this court in behalf of the defend-

ant, to prevent the superior court from proceeding with his trial upon the habitual criminal charge under the supplemental information. These efforts appear in *State ex rel. Edelstein v. Huneke, Judge of the Superior Court,* reported in 138 Wash. 495, 244 Pac. 721, and 140 Wash. 385, 249 Pac. 784, which decisions are of moment touching some legal problems to be hereafter noticed, though of no moment as facts in this controversy. The superior court having overruled the defendant's plea in abatement, demurrer and motion to quash, directed against the habitual criminal charge, on April 1, 1927, he entered his plea of not guilty of the charge of being an habitual criminal. On April 8, 1927, trial upon that charge commenced, resulting in a verdict of a jury as follows:

"Find the defendant guilty of being an habitual criminal, and further find that said defendant has been convicted of a felony two times prior to December 16, 1925."

Thereafter the defendant's motion for arrest of judgment, and in the alternative for a new trial, being overruled, the superior court, on April 26, 1927, rendered final judgment against the defendant sentencing him to life imprisonment in the penitentiary, in pursuance of the provision of Rem. Comp. Stat., § 2286 [P. C. § 8721]. From this final disposition of the case, upon the substantive and supplemental charges, the defendant has appealed to this court.

The principal outstanding facts of this case, as we think the jury were warranted in viewing them and as they evidently did view them, may be summarized as follows: The Paulsen building in Spokane is a large 11-story office building, having its main front entrance, to the north, on Riverside avenue and a side entrance through a stairway into its basement, to the west, on Stevens street. There is maintained in the building,

on each of the ten office floors opening into the hall, a vault with private compartments therein for the use of tenants, each tenant being assigned a separate compartment. The main door of each vault is locked with a Yaletown combination lock. The inside compartments are all locked with keys furnished to the several tenants; the keys so furnished to each tenant being capable only of locking and unlocking the one compartment assigned to such tenant. There was a master key, securely kept by the management of the building, by the use of which all of the private compartments could be unlocked. During the business hours of business days, that is, days other than Sundays and holidays, the main vault doors were, by the building management, kept open, so that the mechanism of the combination locks attached to the inside of the doors was exposed to view and readily accessible, though not so exposed that there could be any reading of the numbers of the combination, so as to learn the combination, without removing a portion of the mechanism. The mechanism of these locks was such that the vital parts thereof could readily and quickly be removed, by one skilled in lock mechanism, from the inside of the doors and then readily taken apart and the combination numbers read. Thus, one so skilled could readily learn the combinations and be enabled to unlock the doors from the outside. One so skilled could also readily replace the parts so removed, without leaving any evidence of the mechanism having been disturbed. The vital parts of the mechanism, capable of being so removed, are so small in volume that they might be absent from a door a considerable period, possibly hours, during the business hours of the day, without their absence being noticed.

A considerable number of the private compartments in the vaults were unoccupied; that is, not assigned to

any tenants at the time of, and for sometime prior to, the burglary. The doors of a number of such compartments were unlocked and were left standing ajar, so that the mechanism of the locks on the inside of such doors was readily accessible to anyone in the vaults wherein such compartment doors were unlocked and stood ajar. The mechanism of those locks could readily have been removed from any of such doors unlocked and standing ajar, and even taken out of the building, without such removal being discovered for a considerable time, even for days. One skilled in the use and manipulation of such locks could, by taking apart one of them after its removal and examining its mechanism, make a master key with which all of the private compartments or all of the vaults could be unlocked as readily as they could be unlocked by the master key kept by the building management. The information acquired by so removing and examining the mechanism of one of those locks and the making of a master key, capable of unlocking all of them, could be accomplished in less than an hour. One expert witness said that this could be done in thirty minutes, under favorable conditions.

The burglary was committed sometime between the closing of the vault doors at the early closing business hours of Saturday, July 22, 1922, and the opening of the vault doors at the beginning of business hours on the morning of Monday, July 24, 1922. The particular burglary, charged and relied upon by the prosecution for a conviction of the defendant, consisted of the opening of the vault door on the ninth floor of the building, followed by the opening of several of the private compartments in that vault and taking therefrom money and Liberty bonds, postal savings stamp certificates and diamonds, aggregating large value.

The prosecution proceeded principally upon the

theory that the defendant committed the burglary by opening the vault door on the ninth floor by ordinary manipulation of the combination lock on the outside, he having learned the combination in the manner we have above noticed that it was possible for one to so learn the combination, and by opening the inside private compartment doors by a master key, made by him, or caused by him to be made, from information acquired by the removal and inspection of the mechanism of one of the compartment locks, in the manner above noticed as a possible way in which such information could be acquired.

Between the early Saturday closing of business hours of July 22, 1922, and the Monday morning opening of business hours of July 24, 1922, several of the vaults on other floors of the building and the private compartments therein were burglarized, evidently in the same manner as the vault and compartments therein upon the ninth floor were burglarized; all plainly indicating, as the jury could and manifestly did believe from the evidence, as constituting one connected burglarizing plan on the part of the person or persons committing the several burglaries, including the burglarizing of the vault and compartments therein on the ninth floor.

It was the custom of the management of the building to cause the doors of all of the vaults, on all of the floors, to be closed and locked at the close of business hours each day, and kept locked until the opening of business hours of the succeeding business day, so that the vault doors were all closed and locked out of business hours, not only during every evening, night and morning between one day and the following day, but throughout all hours on Sundays and other holidays. The vaults were all so closed and kept closed and locked during the entire period from the early closing hours of Saturday afternoon, July 22, 1922, to the

morning opening hours of Monday, July 24, 1922, except as they were opened in the commission of the burglaries here in question. The main front door of the building opening on Riverside avenue was, by the management of the building, always closed and locked at midnight following each business day, and remained so closed and locked until the morning of the following day when it was unlocked. When the front door of the building was so kept closed and locked, one entering the building had to do so by going through the basement stairway into the basement from the Stevens street side of the building, on the west. One so entering could then be taken up by the elevator to the several floors above, some employee of the building being generally there available for that purpose. One so entering the building could also go up the stairs to the several floors above. There were also fire escape steps and balconies rendering it possible for one to go from one floor to another, and at least at one point, by the use of a fire escape balcony, a person could get in and out of the building, over another building, without going into the building by either the front door or the side basement stairway door.

The appellant was seen in Spokane at different times on Friday, Saturday and Sunday, July 21, 22 and 23, 1922. On at least one or two of these occasions, he was seen in the building under such circumstances as to suggest that he was there for some questionable purpose. He was not a tenant of the building.

When appellant was arrested in San Francisco and informed that he was wanted in Spokane, then manifestly understanding that he was wanted in Spokane to answer to the charge of having committed this burglary, he immediately informed the officers arresting him, in substance, that he had the foundation already laid to beat that charge by evidence of an alibi. He, also, then offered to the officers a large bribe in money

and diamonds to let him go, increasing the amount of the offer upon their refusal. He then, and later, made statements evidencing his more than ordinary capabilities as a manipulator of safe locks. The appellant did not testify on the trial.

The evidence introduced in his behalf was practically wholly in support of his claimed alibi; that is, that at the time of the burglary he was not in Spokane but in Lincoln, Nebraska. One of the items of evidence, tending to show the appellant to be in Lincoln at the time of the burglary, or so near that time as to render it probable that he was there rather than in Spokane at the time of the burglary, was his signature on a Lincoln hotel register, apparently as a guest, under the date of July 20, 1922, which signature, as the jury might well believe from the evidence, was written in a space where some other erased signature had been written. There was no direct evidence introduced by the prosecution of the appellant's actual commission of, or participation in, this burglary. Other facts will be noticed, as may seem necessary, incident to our discussion of the several claims of error.

[1] Since the conviction of appellant is rested wholly upon circumstantial evidence, and his counsel here claim error to his prejudice committed by the trial court in the admission of several items of circumstantial evidence introduced by the prosecution, it seems desirable that, at the outset, we notice some fundamental principles touching the admissibility of such evidence, particularly with reference to the remote, or near, relation of particular circumstances, sought to be proven touching the question of the commission of a charged offense, and of the identity of the accused as the one committing the offense. In the text of 2 Bishop's New Criminal Procedure, § 1078, we read:

"As to What Circumstances—are admissible, the only rule is that they must tend to prove the offense and to connect the defendant with it; they may be remote, or they may be near; minute, or of larger dimensions. All will depend upon the particular case."

In 2 Wharton's Criminal Evidence (10th ed.), § 877, that learned author observes:

"There is no test or standard of relevancy from which a rule can be deduced, applicable to all cases, as to what evidence is relevant or irrelevant. The test can be made only in the concrete case. The criterion of relevancy is whether or not the evidence adduced tends to cast any light upon the subject of the inquiry. In circumstantial evidence, we have to deal almost exclusively with inference and deduction, hence, the greater the number of consistent facts, the more certain and complete the deduction. While the rule that the evidence must be relevant to the hypothesis must always be rigidly applied in criminal cases, nevertheless, there should be an enlarged admission of all circumstances that will aid the court and the jury in determining the facts in issue beyond a reasonable doubt."

In *Phillips v. Chase*, 201 Mass. 444, 87 N. E. 755, Chief Justice Knowlton, speaking for the supreme judicial court of Massachusetts, said:

"When circumstantial evidence is largely relied upon to establish an issue, it is inevitable that many matters should be introduced which by themselves alone would be immaterial, although in connection with other evidence they may be helpful in discovering the truth."

In the text of 8 R. C. L. 179, similar general observations are made. These authorities, we think, come as near stating the general rule of admissibility of circumstantial evidence as can be made of general application. This is, after all, necessarily but the general spirit of the law, to be kept in mind as we proceed with

our present inquiries, keeping in mind, as we proceed, that this is a case wholly of circumstantial evidence.

[2]   It is contended, in behalf of appellant, that error occurred, to his prejudice, in the opening statement of the prosecuting attorney, made preliminary to the introduction of evidence in support of the prosecution. The language of the prosecuting attorney, so complained of, is, that "the evidence will further disclose that in his [appellant's] personal effects there were found certain burglary tools;" this referring to the time of his arrest. At this point, counsel for appellant made strenuous objection to the making of this statement by the prosecuting attorney; his objection being, in substance, that such fact would be, at all events, inadmissible, because it occurred at the time of appellant's arrest, approximately three years after the alleged commission of the burglary in question. The court permitted the prosecuting attorney to proceed with his statement, not expressly striking out his language so far used, but then admonished the jury as follows:

"Let me tell the jury now that this opening statement, that Mr. Leavy [the prosecutor] is now making, is in no sense evidence. He is merely outlining what he expects the witnesses will testify to later on, so you must not consider this as any evidence in the case. Now, Mr. Nuzum [appellant's attorney], if evidence of this kind is offered, I will take up your motion at that time."

Later, the prosecution sought to make proof accordingly, but after considerable argument, made out of the presence of the jury, touching its admissibility, the trial court expressed an inclination to exclude such evidence because of the lapse of time following the alleged commission of the burglary. Thereupon the prosecution did not press the offer further, though the court did not expressly rule against the admission. The

trial judge not only admonished the jury as above quoted, but also, in his tenth instruction to the jury at the conclusion of the trial, expressly instructed the jury in part as follows:

"At the beginning of the trial the prosecuting attorney made what is called his opening statement, and, at the beginning of the defendant's evidence, defendant's counsel made his opening statement. What counsel said in their opening statements must not be considered by you as evidence in the case. The purpose of the opening statement is not that the attorneys may give testimony, but simply that they may outline to you what they expect to prove by their witnesses."

The former admonition and this later instruction, given by the court to the jury, clearly, we think, cured any possible prejudicial error that may have occurred by reason of the prosecuting attorney's opening statement and his offer of proof, unless we are to hold that such conduct on the part of the prosecuting attorney was of such a flagrant nature as to become incurably prejudicial. We may assume, for present purposes, that this offered evidence should have been ruled out, as the trial court, in effect, did so rule, but we do not think its inadmissibility was so clearly beyond the realm of legitimate debate as to cause the trial court, or this court, to attribute to the prosecuting attorney bad faith in putting forth his efforts to have it admitted. This, we think, is particularly true, in view of the extraordinary nature of this case and the manner in which the burglary in question was evidently committed. Our decisions in *State v. Boone,* 65 Wash. 331, 118 Pac. 46, *State v. Storrs,* 112 Wash. 675, 192 Pac. 984, 197 Pac. 17, and *State v. Stevens,* 135 Wash. 361, 237 Pac. 723, lend support to our conclusion that there was no error, in any event no incurable error prejudicial to appellant, brought into the case by this opening statement of the prosecuting attorney or his

offer of this evidence, and that the admonition and instruction of the court we have noticed, in any event, cured such possible error.

[3] The seemingly most strenuous contention here made in behalf of appellant is that the trial court erred to his prejudice in permitting the prosecution to place before the jury the testimony of three officers, tending to show special skill and capabilities possessed by appellant to commit this burglary in the apparently skilled manner in which it was committed; which testimony, also, incidentally tended to show his criminal connection with the commission of other similar burglaries. The argument of counsel is, in substance, that proof of the capabilities of appellant in that respect was not admissible, and, particularly, that the prosecution thereby unwarrantedly placed before the jury evidence tending to show the commission of other crimes by appellant. This testimony was introduced over timely and appropriate objections of counsel for appellant. We here quote that portion of it to which the objections were directed. An officer was asked, upon direct examination, and answered as follows:

"Q. Captain, did you have a conversation with this defendant at any time prior to July, 1922, wherein he discussed with you his ability to enter safes and vault doors that had upon them combination locks? A. I did. Q. Now when did you have this conversation, captain? A. In September, 1918. Q. What did this defendant say to you relative to entering safe doors that were protected by combination locks? A. He said he had done that work—several jobs of that kind. Q. How many jobs, or places, captain? A. At least seven in Seattle, three in Spokane, one in Vancouver, two in Aberdeen and one in Hoquiam. Q. Did he say anything to you in that conversation, or those conversations, as to the kind of buildings where those safes were? A. Office buildings. Q. And as to the day of the week when those jobs were done? A. They were done between Saturday night and Tuesday morn-

ing—the week end [further answers plainly indicating
that the 'week end' meant the inclusion of a holiday
following Sunday if a holiday occurred on Monday.]
Q. Did he state as to the nature of the property he
procured? A. He did. Q. What was it? A. Liberty
Bonds, Canadian Victory Bonds, War Savings Stamps,
diamonds and cash.''

This officer was asked, upon cross-examination, and
answered as follows:

''Q. You testified something about Mr. Edelstein
telling you with reference to opening safes and locks—
I will ask you if Mr. Edelstein didn't say to you that
each one of those safes were either unlocked or on a
half hitch? A. He used the expression 'short com-
bination'—they were all on short combinations, all the
jobs he did, all the safes he worked from a short com-
bination. Q. Did he explain what that meant? A.
He did. Q. What did he say? A. He explained that
many business men leave their safes on what he called
a short combination, and explained that was turning
the dial just a few points one way, and by taking hold
of the handle of the safe, by putting pressure on it you
could turn the dial back to the number and the safe
would open.''

An officer, who had brought the defendant from San
Francisco to Spokane, was asked, upon direct exami-
nation, and answered as follows:

''Q. Captain, when did you return to the state of
Washington with the defendant? A. The morning of
October 30th. Q. Did you have any conversation with
this defendant relative to his ability to enter combina-
tion locks and safes or vaults? A. I did. Q. When
did you have that conversation? A. We left San
Francisco in the evening, and the next day I was
talking to him practically all of that day. Q. What
was the substance of the conversation with reference
to his ability to enter doors of safes and vaults that
were protected with combination locks? A. He told
me that in many cases the safes were left unlocked,
and that many others were left, on what he called, a
half hitch turn of the tumblers, and frequently he

found them that way, and was able to open them without any trouble. Q. What did he say, if anything, with reference to entering safes or vaults here in the city of Spokane? A. He said he had entered the Sherwood Block, the Symons Block and the safe in the Federal Land Bank."

A San Francisco officer, who aided in making the arrest of appellant and who had testified with reference to appellant's offering a bribe for his freedom, as we have already noticed, further testified as to his conversation at that time with appellant as follows:

"I said to Edelstein 'Izzy, if all they say about you is true, you must be a wonderful man with a safe'—and he says 'I have capabilities, but I didn't do that Spokane job.'"

While this court has recognized and adhered to the general rule, that evidence of independent, unrelated crimes having been committed by the accused are not admissible as proof of the commission of the crime for which he is being tried, yet there are well recognized exceptions to this general rule. One is, that evidence, otherwise admissible, does not become irrelevant or incompetent, merely because it also tends to show that the accused has committed another crime, unrelated to the one for which he is being tried. 16 C. J. 588; 8 R. C. L. 199. The following of our own decisions are in harmony with this view of the law: *State v. Hyde,* 22 Wash. 551, 61 Pac. 719; *State v. Leroy,* 61 Wash. 405, 112 Pac. 635. So, if this testimony was admissible to prove the special skill possessed by appellant as a manipulator of locks, it was not rendered inadmissible because it tended to prove his criminal connection with other burglaries.

Evidence tending in some substantial degree to show that an accused possessed special skill, such as would enable him to commit the crime for which he is being tried, it apparently having been committed in a man-

ner requiring such special skill in its execution, we think is admissible. In 1 Wigmore on Evidence (2d ed.), § 83, that learned author says:

"As indicating the likelihood of a person doing or not doing an act in question, his physical capacity (or lack of it), his technical skill (or lack of it), and his possession (or lack) of the appropriate means or tools, are usually of sufficient probative value to be admissible. The circumstances of each case usually make it clear whether one of these data is there relevant; and no more detailed rules need to be laid down, nor has any important controversy arisen over the relevancy of this species of evidence. The considerations that have led to exclusion of such facts in a few instances have usually been considerations affecting some other use or aspect of the evidence, with which the present use was confounded. . . . As a general principle, then, the *existence or lack of the physical capacity, skill, or means* to do an act is admissible as some evidence of the possibility or probability of the person's doing or not doing it."

Having in view the skill which evidently was exercised in the commission of this burglary, and appellant's opportunity to commit it, we are of the opinion that the testimony of these officers was admissible, as tending to show appellant's special skill enabling him to so commit the offense.

We are also of the opinion that, in the placing of the testimony of these officers before the jury, the prosecution did not incidentally, unwarrantedly place before the jury proof of appellant's having committed other independent, unrelated crimes. According to their testimony, appellant was informing them of his capabilities as a manipulator of locks; and, to convey that information to them, he emphasized it by stating instances of his actual accomplishments along that line.

[4] Contention is made that the trial court erred to the prejudice of appellant, in permitting proof of the burglarizing of vaults and private compartments

therein on other floors of the building, occurring be-
tween the early closing business hours of Saturday,
July 22, 1922, and the opening business hours of the
morning of Monday, July 24, 1922. These burglaries
seem so manifestly a part of one plan and system, of
which the burglary charged against appellant was also
a part, as to render proof of any, or all, of them ad-
missible. 16 C. J. 591. The following of our own
decisions are in harmony with this conclusion, though
we do not cite them as all being exactly in point: *State
v. Craemer,* 12 Wash. 217, 40 Pac. 944; *State v. Burton,*
27 Wash. 528, 67 Pac. 1097; *State v. McDowell,* 61
Wash. 398, 112 Pac. 521, Ann. Cas. 1912C 782, 32 L.
R. A. (N. S.) 414; *State v. Thompson,* 132 Wash. 124,
231 Pac. 461.

[5] It is contended that the trial court should not
have permitted the engineer of the building, having
charge of the keys of the main front door, to testify
that the lock of the front door had been tampered with,
as was discovered Sunday morning, July 23, 1922, so
that the door could not then be unlocked with the key.
The engineer testified: "I found that the tumblers
had been turned so that the key wouldn't enter."
Clearly, this was admissible as tending to show an at-
tempt by someone to prevent ready access to the build-
ing during the night, and also possibly with a view of
preventing ready access during Sunday, a circum-
stance to be considered with all the other circum-
stances, remembering that this is a case wholly of cir-
cumstantial evidence.

[6] It is contended that the trial judge erred, to
the prejudice of appellant, in permitting the manager
of the building to testify, on re-direct examination by
the prosecuting attorney, in substance, that a detective
had told him that appellant had committed the bur-
glaries in question. Prior thereto the manager had

testified, at some length, concerning what he had found as to conditions following the burglaries and as to his placing the matter in the hands of the police and their reporting thereon to him. On cross-examination by counsel for appellant, he was quite vigorously questioned touching his conversations with officers, particularly with a detective who was working upon the case; the cross-examination being a strenuous seeking, on the part of counsel for appellant, to show what the detective had said, inducing the manager to believe the burglary to have been a so-called inside job; that is, as having been committed by some employee of the building. In an effort, on the part of the prosecuting attorney, to bring out the whole of the conversation between the manager and the detective and to counteract the highly probable impression left by the cross-examination with the jury, the manager was asked by the prosecuting attorney and answered as follows:

"Q. Did he [the detective] report to you whose work it was? A. Yes. Q. What did he tell you? A. He told me that he thought it was Isadore Edelstein had done it."

This answer was allowed by the court to stand, though sought by counsel for appellant to be stricken. Under all the circumstances, it seems to us that we should not now hold this to be reversible error, in view of the manner in which it came into the record. It was, in substance, but a calling for the whole of a conversation, part of which had been called for by the cross-examination of the manager by counsel for appellant. *White v. Territory,* 1 Wash. 279, 24 Pac. 447; *State v. Freidrich,* 4 Wash. 204, 29 Pac. 1055, 30 Pac. 328, 31 Pac. 332; *State v. Regan,* 8 Wash. 506, 36 Pac. 472.

[7] Contention is made that the trial court erred, to the prejudice of appellant, by the admission in evidence of diamonds taken from him at the time of his

arrest. This objection seems to rest upon the theory
that the diamonds so taken from appellant were in-
admissible as tending to show a crime committed by
him some three years previous. However that may be,
these diamonds were admissible in evidence in con-
nection with the testimony of the bribe that was of-
fered by appellant to the officers at the time of the
making of his arrest, they being offered as a part of
the bribe, together with money.

[8]  Contention is made against the admission of
testimony tending to show the possibility of appel-
lant's being absent from Spokane, by the aid or partial
aid of aeroplane transportation, at the time of the com-
mission of the burglary; that is, the possibility of his
being in Lincoln, Nebraska, and St. Louis, Missouri,
as claimed in his behalf, and also in Spokane, when
the burglary was committed. It is somewhat difficult
for us to follow counsel for appellant touching the
question of the admissibility of this evidence. We are
unable to see, as the matter is here presented, any
argument against the admissibility of this evidence,
other than its lack of weight. Indeed, counsel for ap-
pellant seem to proceed upon that theory. We are of
the opinion that the court did not err in allowing this
evidence to go before the jury for whatever it was
worth, though apparently it was of but little probative
value.

[9]  Contention is made, in behalf of appellant, that
the trial court erred, to his prejudice, in admitting in
evidence enlarged photographs of the signature of ap-
pellant found upon the Lincoln hotel register under
the date of July 20, 1922. These photographs seem to
us to have been taken under fair conditions and have a
tendency to show that appellant's signature upon the
hotel register, as of that date, was written in a space
wherein there had previously been written another

signature which had been erased. We are of the opinion that no error was committed in admitting these photographs in evidence, together with the testimony of those who made them, as tending to show that appellant's claimed alibi was not supported by the evidence he offered in that behalf.

[10] Contention is made that the prosecuting attorney, in his closing argument to the jury, made intemperate and unwarranted remarks, prejudicial to the rights of appellant. As the claimed objectionable remarks are presented here, we cannot say that there occurred any reversible error therein. We do not find in the record any objection interposed thereto at the time they were made, nor any attempt to have the trial court then interfere and check such argument. The record, as a whole, is suggestive of justification therefor. Observations made by Judge Fullerton in our decision in *State v. Evans,* 145 Wash. 4, 258 Pac 845, would be, in a large measure, appropriate here. See, also, *State v. Armstrong,* 37 Wash. 51, 79 Pac. 490; *State v. Marion,* 68 Wash. 675, 124 Pac. 125; *State v. Peeples,* 71 Wash. 451, 129 Pac. 108. The trial court's instructions plainly gave the jury to understand that their verdict must be rested entirely upon the evidence introduced upon the trial, and not upon remarks and argument of counsel, except in so far as such remarks and argument were justified by the evidence introduced.

[11] Contention is made that the supplemental information, in so far as it charges the prior conviction of appellant in the Missouri court, is insufficient, in that it failed to charge facts showing that the crime of burglary, of which the appellant was convicted under the laws of Missouri, was a "crime which, under the laws of this state, would amount to a felony." The habitual criminal statute of this state, applicable to this controversy, reads:

"Every person convicted in this state of any crime of which fraud or intent to defraud is an element, or of petit larceny, or of any felony, who shall previously have been twice convicted, whether in this state or elsewhere, of any crime which under the laws of this state would amount to a felony, or who shall previously have been four times convicted, whether in this state or elsewhere, of petit larceny, or of any misdemeanor or gross misdemeanor of which fraud or intent to defraud is an element, shall be punished by imprisonment in the state penitentiary for life." Rem. Comp. Stat., § 2286.

Our decisions in *State v. Rowan,* 84 Wash. 158, 146 Pac. 374; *State v. Gustafson,* 87 Wash. 613, 152 Pac. 335; *State v. Cotz,* 94 Wash. 163, 161 Pac. 1191, and *State v. Spencer,* 130 Wash. 595, 228 Pac. 689, while not all directly in point here, lend strong support to the conclusion that, since the charge of the Missouri conviction is substantially in the language of our habitual criminal statute, above quoted, it is sufficient as a pleading of the Missouri judgment of conviction for the purpose of this prosecution. The concurring opinion of Judge Chadwick in *State v. Cotz, supra,* we conceive to be a sound statement of law as to the sufficiency of this charge, wherein he said:

"When the prosecuting attorney has charged, by simple reference to the judgments, that a party has been convicted three times, he has done all that the law requires, for it is not a question of guilt or innocence, but merely a question involving a state of the record, either in the court where the charge is made, or some other court. It is necessary, when pleading a judgment, to say no more than that a judgment (describing it) was rendered in a certain court at a certain time."

The proof showed, by a duly certified transcript and by testimony as to appellant being the same person convicted in the Missouri court, that he was therein convicted by final judgment of burglary, and sentenced to imprisonment in the penitentiary of that state for

a period of two years. It thus sufficiently appears, we think, that the crime for which he was there so convicted was a crime which, under the laws of this state, would amount to a felony. All burglaries of whatever degree are felonies under the law of this state. Rem. Comp. Stat., §§ 2253, 2578, 2579 [P. C. §§ 8688, 8771, 8772]. In the absence of affirmative proof to the contrary, as this case is before us, we must now presume that the burglary, of which appellant was convicted in Missouri, would also be a felony under the laws of this state. We conclude, therefore, that the judgment of that conviction was sufficiently pleaded and proven.

[12] Looking to the avoiding of the effect, in this prosecution, of appellant's prior conviction, in the superior court for King county, of the crime of burglary in the second degree, of which the evidence here was amply sufficient, his counsel offered in evidence his later unconditional pardon thereof by the governor of this state, appellant having at that time been confined and served a portion of his sentence of five to fifteen years to the extent of approximately two years thereof. This offer of proof was by the court rejected, upon the objection of the prosecuting attorney, as being of no avail to appellant in avoidance of this habitual criminal charge. This, it is contended, was error, the argument being that such pardon so completely obliterated that conviction that it could, in no event, be invoked as a former conviction, as lending support to the habitual criminal charge made against him by this supplemental information. While recognizing that there are conflicting views, entertained by the courts of the United States, as to the effect of a pardon upon a prior conviction, when such prior conviction is sought to be invoked in support of an habitual criminal charge, it seems to us that the weight of authority is against the contention here made in

behalf of appellant. In 1 Bishop on Criminal Law (9th ed.), § 963, Sub. 4, that learned author says:

"It has been held in Ohio that a pardon obliterates an offense and that hence the conviction in regard to which it is granted is not a former conviction within the habitual criminal act. This reasoning is very technical. A person who has received clemency but instead of reforming persists in his evil ways certainly should not as to a subsequent offense be treated better than if the pardon had been denied. Accordingly the Kentucky Court has held that such a pardon does not relieve him from any penal consequences resulting from his subsequent offenses, and this reasoning has been adopted by the United States Supreme Court."

In *Herndon v. Commonwealth*, 105 Ky. 197, 48 S. W. 989, in what seems to be considered one of the leading decisions touching this question, Judge Hobson, speaking for the court, said:

"It is also insisted that appellant is not liable for the increased penalty imposed by the statute on a third conviction of felony by reason of the fact that he was pardoned by the governor of the crime of which he was first convicted, and an instruction to this effect was asked and refused on the trial. This question was presented to this court in the case of *Mount v. Com.*, 2 Duv. 93, where it was held that the pardon had not this effect. The court said: 'The pardon relieved the convict of the entire penalty incurred by the offense pardoned, and nothing else or more. It neither did nor could relieve from any penal consequence resulting from a different offense, committed after the pardon, and never pardoned. The increased punishment prescribed by the statute for the subsequent offense was no part of the penal consequences of the first offense, but applied exclusively to the last, as aggravated by its repetition of the same crime. The legislature, as required by justice and policy, ought to have provided a severer punishment for repeated than for only one crime; and

whether it had done so, by duplicating for a second offense the punishment of the first, or by any other measure of augmentation, cannot be material. In any aspect, the augmented punishment is for the last, and not at all for the first, offense; and, of course, a pardon of the first could in no way or degree operate as a pardon of the last offense, or remission of any portion of the punishment denounced for the perpetration of it.' This case was afterwards followed in *Stewart v. Com.*, 2 Ky. Law Rep. 386, and it seems to us that the circuit court ruled properly in refusing the instruction asked."

Similar observations were made by Judge Miller, speaking for the New York supreme court in *People v. Carlesi*, 154 App. Div. 481, 139 N. Y. S. 309, touching the effect of a pardon of the same nature as that here involved, as follows:

"The second proposition is based on the following language of Mr. Justice Field, speaking for the majority of the United States Supreme Court in *Ex parte Garland* (4 Wall. 333, 380), viz: 'A pardon reaches both the punishment prescribed for the offense and the guilt of the offender; and when the pardon is full, it releases the punishment and blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he had never committed the offense. If granted before conviction, it prevents any of the penalties and disabilities consequent upon conviction from attaching; if granted after conviction, it removes the penalties and disabilities, and restores him to all his civil rights; it makes him, as it were, a new man, and gives him a new credit and capacity.'

"The appellant cites many cases in which that language has been quoted or referred to with approval, one case in which the precise proposition contended for by him seems to have been decided (*Edwards v. Commonwealth*, 78 Va. 39), and Bishop on New Criminal Law (Vol. 1, § 919), wherein the author takes the view that a second offense, the first one having been pardoned, is not a second but a first offense.

"The precise point does not seem to have been de-

cided in this State and, so far as the research of
counsel goes, has been decided in only two States, the
Supreme Court of Appeals of Virginia in *Edwards v.
Commonwealth* (*supra*) taking the appellant's view,
and the Court of Appeals of Kentucky holding to the·
contrary. (*Mount v. Commonwealth,* 63 Ky. [2 Duval]
93; *Herndon v. Commonwealth,* 105 id. 197.) The case
nearest in point in this state is *People v. Price* (53
Hun, 185; affd. on the opinion below, 119 N. Y. 650).
But the appellant seeks to distinguish that case by the
fact that the pardon for the first offense was granted
by the Governor of the State of Georgia, and that the
decision was put upon the ground that the Legislature
of the state of New York was not controlled by the
Constitution or laws of the State of Georgia. While
that point was made by Mr. Justice Landon, writing
for the General Term, his opinion, which was adopted
by the Court of Appeals, put the decision on a much
broader ground, namely, that the conviction was not
obliterated by the pardon but remained as a fact in
the past history of the defendant and that the punish-
ment for the second offense was solely for that and not
at all for the offense committed in Georgia; and
necessarily, the latter proposition is correct, else all
the statutes providing for increased punishment for
second offenses would be unconstitutional. (See *People
ex rel. Cosgriff v. Craig,* 195 N. Y. 190.)

"Manifestly, the language of Mr. Justice Field,
quoted *supra,* is to be read in its bearing upon the
precise point before the court. The pardon of this de-
fendant did not make 'a new man' of him; it did not
'blot out' the fact or the record of his conviction, and
of course, the Supreme Court, in deciding that the Con-
gress could not impinge upon the pardoning power of
the Executive did not intend to hold that the Executive
could blot out a solemn record of the judicial branch
of government. (See *Roberts v. State of New York,*
30 App. Div. 106; 160 N. Y. 217.) The pardon in this
case merely restored the defendant to his civil rights.
If it had been granted before his term of imprisonment
had been served, it would also have relieved the defend-
ant of that. But it did not obliterate the record of his
conviction or blot out the fact that he had been con-

victed. (Matter of ——, an Attorney, 86 N. Y. 563.) It relieved the defendant of the consequences which the law attached to his offense. But the defendant is to be punished now solely in consequence of his second offense. The fact of the former conviction is an element merely in determining the criminality of the second offense. (*People v. Sickles,* 26 App. Div. 470; 156 N. Y. 541; *People ex rel. Cosgriff v. Craig, supra.*) The legislature of this state has said that one who commits a crime, after having been convicted of another crime, is a greater offender than as though he had not previously been convicted, and the punishment inflicted is solely for the second offense to which a greater degree of criminality is thus attached. That degree of criminality is not at all lessened by the fact of a pardon which assumes his guilt, remits the punishment and affords him an opportunity to become a law-abiding citizen. It was solely within the province of the legislature to attach such greater criminality to the second offense from the mere fact of a conviction for a first, and the Executive by the exercise of the pardoning power could no more interfere with that exercise of legislative power than the legislature could interfere with the power to pardon.''

That decision was affirmed upon appeal and this language of the appellate division of the supreme court adopted by the court of appeals in 208 N. Y. 547, 101 N. E. 1114. This reasoning was apparently acquiesced in by the supreme court of the United States, the case being taken by writ of error to that court, in *Carlesi v. New York,* 233 U. S. 51, though that court dealt principally with the question of whether or not Carlesi's federal constitutional due process of law guaranties were violated by his conviction, after pardon, as an habitual criminal. In *People v. McIntyre,* 99 Misc. Rep. 17, 163 N. Y. Supp. 528, the appellate division of the New York supreme court again adhered to this view of the law. The question has not been squarely before this court, but we have at least three decisions, the reasoning of which

seems to lend support to this view of the law.   In
*State v. Serfling,* 131 Wash. 605, 230 Pac. 847, we held
that a pardon did not prevent proof of a prior convic-
tion of crime against a witness from being used in
evidence as affecting his credibility.   In *State ex rel.
Edelstein v. Huneke,* 138 Wash. 495, 244 Pac. 721, the
following observations were made in the majority
opinion:

"It was said in argument that the habitual criminal
proceeding is an independent action on a separate and
distinct charge.   If by this is meant a separate and
distinct offense it must be borne in mind that the
statute does not create any offense.   It is no crime to
be one 'who has been previously convicted' no matter
how many times.   One who has been convicted and
served his sentence has paid the penalty of his crime,
and may not thereafter be punished again for any or
all of the offenses he has committed.   Much of the
misunderstanding of this and like statutes has arisen
from language employed in decisions which seemed to
indicate that one who is being tried upon an habitual
criminal information is being tried for an offense.   The
severer penalty provided by statute for one who is an
habitual criminal is not imposed for any offense except
the last one upon which the defendant has been con-
victed, and not yet sentenced.   The hearing upon the
habitual criminal charge is merely for the purpose of
determining what manner of man the defendant is, so
that the sentence upon the last offense (in this case
the burglary charge) can be in accordance with the
statute.   The question of previous convictions is im-
portant only to determine whether, taken in conjunc-
tion with the last offense, the defendant has shown a
persistence in crime which authorizes the severer
penalty."

And in *State v. Hazzard,* 139 Wash. 487, 247 Pac.
957, we held that, following a conviction that resulted
in the depriving of the defendant of her license to
practice medicine, she being so deprived solely for that
cause, a pardon by the governor, though it, in terms,

purported to "restore her to all the rights and privileges she forfeited by reason of her conviction," did not restore her to her prior license rights. These of our decisions somewhat plainly indicate the view of this court that a pardon, however unconditional and absolute, does not make the one convicted "a new person," as some of the authorities, speaking generally, assert, in the sense that such prior conviction is wiped out for every purpose. The decisions holding to the contrary of this view are those of the Ohio court in *State v. Martin,* 59 Ohio St. 212, 52 N. E. 188, 43 L. R. A. 94, and the Virginia court in *Edwards v. Commonwealth,* 78 Va. 39. The former is a rather brief *per curiam* opinion. The latter, it must be conceded, is an ably argued decision. There have not been brought to our attention any decisions directly in point touching our present problem, other than these Kentucky, New York, Ohio and Virginia decisions. We are of the opinion that, in view of the expressions in our own decisions above noticed and what we conceive to be the weight of authority, we should adhere to the law as announced in the Kentucky and New York decisions above quoted from. We conclude, therefore, that the trial court did not err in excluding proof of the pardon of appellant offered in his behalf.

[13] The method of procedure in bringing into the court for trial this habitual criminal charge, supplemental to the principal charge, is again challenged upon constitutional grounds as it was challenged in *State ex rel. Edelstein v. Huneke,* 138 Wash. 495, 244 Pac. 721, and in 140 Wash. 385, 249 Pac. 784, wherein attempts were made, by prohibition proceedings in this court, to prevent the trial court from proceeding with the trial of the habitual criminal charge. This contention is rested upon the ground that appellant

was, in effect, twice placed in jeopardy for the same offense, ''contrary to Art. 14 of the Constitution of the United States;'' that he has thereby been deprived of his liberty without due process of law ''contrary to Art. 14 of the Constitution of the United States;'' and that such procedure has, in effect, denied to appellant the equal protection of the laws, ''contrary to the provisions of the 14th amendment to the Constitution of the United States.'' We think these contentions have been decided adversely to appellant by our decisions in *State ex rel. Edelstein v. Huneke,* 138 Wash. 495, 244 Pac. 721, and 140 Wash. 385, 249 Pac. 784, and we now adhere to that same conclusion. We thus specifically dispose of these Federal constitutional questions, to the end that it be made plain that they have been presented to and decided by us adverse to the claims of appellant.

Contention is made that the evidence is not sufficient to support the verdict and final judgment, particularly as to the original substantive charge. We have examined this voluminous record with painstaking care and are well satisfied that this contention cannot be sustained. What we have already said in relating the facts of this case, as the jury might have viewed them and manifestly did view them, we think, is all that need be here said touching this contention, though we think there are some other proven minor circumstances which lend aid in support of the verdicts and judgment.

Some other trial errors than those above noticed have been claimed and briefly argued. We have also examined these with care and conclude that they are not of sufficient merit to render detailed discussion of them necessary here. Our ultimate conclusion, therefore, is, that defendant, so far as can be discerned in this record, has had a fair trial, and that the evidence fully justified the jury: First, in finding him guilty of

the substantive charge; and second, in finding him guilty of being an habitual criminal.

The judgment is affirmed.

MACKINTOSH, C. J., MAIN, TOLMAN, ASKREN, FRENCH, MITCHELL, and FULLERTON, JJ., concur.