The defendant was charged and convicted with having committed an infamous crime against nature and was sentenced to an indefinite term in the State Prison. He appeals. His first assignment relates to the examination by the court of some of the jurors on voir dire. By our statute, Comp. 1, 2 Laws Utah 1917, § 8927, it is provided that in criminal cases "the examination of the jurors shall be conducted by the judge," but that he may also permit counsel for either side to examine the jurors, but such examination by counsel shall be limited by the court; and that "no action of the court under this section shall constitute error except in cases of clear abuse of discretion." The complaint made, in effect, is that the manner in which the examination was conducted by the court tended to impress the jurors, though not so intended, with the duty to convict the accused to protect society. The particular questions asked one or more of the jurors and of which complaint is made are: *Page 36 
"Q. You are in favor of law enforcement, are you? A. Yes, sir.
"Q. You feel that the State must be protected, and the people of State and the society of the State must be protected against people who are committing crimes, do you? A. Yes, sir.
"Q. Your feeling in that regard does not inspire you to want to vote for the conviction of a man who might be innocent? A. No, sir.
"Q. You accord to every man who is accused of crime the benefit of the doubt, do you? A. Yes, sir.
"Q. The law imposes that duty upon you? A. Yes, sir.
"Q. The law of this State is that when a man is accused of crime the State must prove beyond a reasonable doubt that that man is guilty, or you must vote for an acquittal? A. Yes.
"Q. You are an officer of the court, and it is your bounden duty to use the best sense and judgment that you have to be as fair and honest as God has given you the wisdom to be in the trial of these cases. It is your bounden duty to protect innocent people who might be accused of crime, and enforce the law where the law has been violated, as an officer of the court. If you are unwilling to do that you are not and would not be a good juror. Now you are willing to do that are you? A. Yes, sir.
"Q. We do not want men to serve on juries who are afraid to vote for the right, whether that be for conviction or an acquittal. We want men to serve on juries who have the courage of their convictions, who have a keen sense of right and wrong, who are honest, who are fearless, who are in favor of enforcing the law, who are opposed to imprisonment of men who might be innocent. We don't want any doubt about that, neither with the jury nor with counsel nor anybody else in the case. We want it very plainly understood that what we want from the jury is a determination of the facts, and then an honest, conscientious, fearless judgment. I take it, of course, if you are called to serve that you will vote according to your feeling in the matter? A. Yes, sir."
We do not see anything substantial to the assignment. The record shows that further and other examinations of jurors were had, but what the character was of such examination, or what was developed thereby, is not made to appear. Not anything being shown to the contrary, it may be that from questions propounded and answers made or examinations had preceding the questions complained of, matters were developed which naturally called for the questions complained of. Further, we do not see anything objectionable *Page 37 
to the questions propounded unless it be the last two questions, because they were more in the nature of admonitions to the jurors than of ascertaining state of mind. Yet, from preceding questions propounded and answers made or examinations had, not disclosed by the record, such admonitions may have well been justified. Undoubtedly the court in such particular has great latitude in ascertaining the fitness and competency of jurors to sit in a cause. Not anything is made to appear wherein that discretion was abused, at least not to the prejudice of the defendant. That assignment is thus overruled.
The defendant, however, to reverse the judgment more particularly relies on an assignment whereby it is urged that the court erred in admitting testimony of a witness with respect to a distinct and separate offense similar to that charged by the information but in no particular related thereto or connected therewith and being entirely distinct and separate transactions. To review that it is necessary to refer to the evidence more in detail.
The defendant by the information was charged with committing the offense June 2, 1931, on the body of Thomas Edwards, a senior high school boy about fifteen years of age. The boy in substance testified he had known the defendant about four months; that prior to the alleged offense he had been to the defendant's room upstairs in the Venice Hotel in Salt Lake City on several occasions, but no improper relations were then had and that the defendant on such occasions "treated me very nice"; that on the occasion in question he casually met the defendant on the street about 11 o'clock in the forenoon and at the defendant's request went with him to the defendant's room; that they there talked a little while on things in general, just what, the witness did not remember, and then the defendant started "kissing me and loving me and then he slid down my pants" and pushed him on the bed and "inserted his penis into my rectum." When asked if he said or did anything, the witness *Page 38 
answered he did not and that he "did not see any reason why I should resist from it." The witness further testified that no resistance or objection was made by him, and so far as anything made to appear to the contrary, he voluntary submitted to the commission of the offense. He further testified that was the first time the defendant "did that to me," but that his "boss" (not the defendant) did that to him on two occasions, the first time about the first of May and the other about the last of May.
Such witness was the only witness called by the state and at the conclusion of his testimony the state rested. Thereupon a motion was made by counsel for the defendant for a directed verdict of acquittal on the ground, among others, of insufficiency of the evidence, in the particular that 3 the witness Edwards was an accomplice and to justify a conviction on his testimony required corroboration. Because of the youth of the boy on whom the offense was committed, the state expressed doubt as to the necessity of corroboration as would be required in case the person upon whom the offense was committed had been an adult. After further discussion of the matter a recess was taken. When the court reconvened the state asked to reopen the case and introduce further testimony, the district attorney stating that during the recess he learned further evidence could be had on behalf of the state and that a witness was then on hand whose testimony could be taken without delay. Over the objection of counsel for the defendant, the case was reopened and the state permitted to give further evidence.
A point is made as to the ruling reopening the case. That is without merit. It was within the discretion of the court to permit the case to be reopened. No abuse of discretion is shown in doing so.
The other witness, also a boy between fifteen and sixteen years of age, was thereupon called by the state. After giving his name, residence, his schooling in the high school, etc., *Page 39 
he was then asked concerning his acquaintance with the defendant. He testified that he knew the defendant for 4 a few months, around the month of June, 1931; did not remember the exact date. He further was asked and he answered that he knew where the defendant lived. He then was asked, "Q. Did you ever go to his home?" That was objected to by counsel for defendant, that he did not see the materiality of it unless the state was endeavoring to prove some other offense, which he claimed was incompetent and immaterial. The court observed that if such was the purpose, the testimony was inadmissible. Thereupon the district attorney stated, "That is not the purpose." Counsel for the defendant: "What is the purpose then?" The district attorney: "If you will sit down and be patient you will hear." The objection was overruled. The examination of the witness thus proceeded:
"Q. Did you ever go to his home? A. Yes sir, I have.
"Q. Did you ever go there in the month of June? A. Yes sir.
"Q. How many times? A. About twice, in the month of June.
"Q. What times did you go there, what were the two times? A. I don't know the exact date, I believe it happened on a Sunday.
"Q. You went there one Sunday in June? A. Yes sir.
"Q. Did you go there with the defendant? A. Yes sir.
"Q. Did you have a conversation with the defendant?"
All that was objected to by counsel for the defendant and the objections overruled. After the witness again testified as to the place where the defendant lived and that he went with the defendant to his room on the 15th or 16th of June, he again was asked, "Q. Now you may state what the conversation was?" To that further objections were made, whereupon the court stated that if the testimony was not material it would be stricken, and overruled the objections. The witness then answered:
"A. He (the defendant) met me somewhere around Pioneer Park, and asked me to go down, he wanted to show me where he lived, so I went down to his place with him.
"Q. Yes. A. That is about all the conversation was then between me and him, till I got to his place. *Page 40 
"Q. What was the conversation after you got to his place? A.Well, we did not talk about much. He just did things.
"Q. What did he do? (Italics ours.)
Thereupon further objection was made that the state was trying to prove another crime. The district attorney: "You don't know whether it is or not." Counsel for defendant: "That is evident all the way through." The court overruled the objection, "for the time being," and thus the witness in response to the question, "What the defendant did?" answered:
"Well, he started to loving me and kissing me, and took down my pants.
"Q. What did he say, if anything? A. After he done that I made some demands. He also told me that a friend of mine had been there.
"Q. Did he say who the friend was? A. Yes sir.
"Q. Who did he say? A. Thomas.
"Q. Thomas who? A. Edwards.
"Q. He is in the court room, is he? A. Yes sir. (The witness pointing at Thomas Edwards.)
"Q. Just tell me all that was said at that time? A. Well, he asked me a few things about Thomas.
"Q. What did he say? A. I had not known him very long. I just happened to move to the same apartment house where he lived.
"Q. What did he say about Thomas? A. He told me he would not hurt me; that Thomas had been there before.
"Q. Who told you he would not hurt you? A. The defendant in this case.
"Q. He told you that he would not hurt you? A. Yes sir.
"Q. Who did he say had been there before? A. Thomas.
"Q. What else did he say? A. That is about all he said to me.
"Q. When he started to love and kiss you, and took yourtrousers down, what did you do? A. I tried to stop it, but hehad the door locked.
"Q. Was anything further said than what you have testified to, — by the defendant or by you? A. No sir, that is all he said to me.
"Q. I will ask you whether or not the defendant, at any time, ever gave you any money? A. Yes sir, he did." (Italics ours.)
All this was objected to by counsel for the defendant and the objections overruled, except the last question and answer, which were stricken. *Page 41 
On cross-examination the witness testified that he went to the defendant's room, as stated in his direct examination, about 7:30 in the evening; that on that day he worked at a shoe-shine parlor and at about 6:30 o'clock he went to Pioneer Park to play tennis, where he expected to meet Thomas; that waiting for him and Thomas not arriving, the witness started home, and on the way he met the defendant, who invited him to see his room upstairs in the hotel. He repeated the matters testified to upon his direct examination as to the defendant loving and kissing him and pushing him away, but otherwise did not do anything. He again was asked just what the defendant said to him with respect to Thomas, and he answered:
"A. He said: `You don't need to be afraid of me.' He said, `A friend of yours came up here and seen me.'
"Q. That is all he said? A. Yes.
"Q. That is all that was said? A. Yes.
"Q. Nothing else? A. No."
He further testified that he knew whom the defendant meant though he did not mention any other name but "Thomas"; that he had no other friend by the name of Thomas; and that the defendant told him he had seen the witness and Thomas playing tennis at the park. He further testified that he twice had committed similar crimes with another man, an old man named "Jim"; that "there was a case between me and him"; and that he testified in such case at a preliminary hearing.
There being some difference in the testimony of the witness in his direct and in his cross-examination as to the language used by the defendant when referring to Thomas, the district attorney on redirect again asked the witness just what the defendant in such particular said, and the witness answered:
"Q. When you were up in the room there (in the defendant's room) and he said Thomas had been there, I will ask you if he said what Thomas? A. No; I knew whom he meant when he said `Thomas.' *Page 42 
"Q. Did he describe the Thomas in any other way? A. He said the one I had been playing tennis with.
"Q. Have you played tennis with Thomas Edwards in Pioneer Park? A. Yes sir, lots of times.
"Q. Have you played tennis with any other Thomas in Pioneer Park? A. I don't know any other boy named Thomas. * * *
"Q. Just state what he (the defendant) said, as near asyou can? A. Well, he told me that Thomas had been up there andseen him, and he also asked me if he had left for California, that is one other think he asked me.
"Q. If Thomas had left for California? A. Yes.
"Q. Anything else? A. No sir." (Italics ours.)
At the conclusion of that testimony the state again rested. Counsel for the defendant thereupon made a motion that the testimony of the last witness be stricken on the ground, among other grounds, that the purpose of the testimony was to show the commission of another offense similar to that charged in the information. The motion was overruled. Counsel then renewed his motion for a directed verdict, which also was denied.
As is seen, the state disclaimed the evidence admissible to show the commission or attempted commission of another offense. But when the district attorney was asked for what purpose the testimony was sought, he merely told counsel for defendant to sit down, be patient, and "you will hear." Thus no purpose was disclosed. Let it be assumed the district attorney was not required to forewarn the witness or counsel or to disclose the purpose for which the evidence was sought. The ruling, however, is here defended by the Attorney General on the theory that the testimony was admissible to show an admission on the part of the defendant that the alleged crime was committed by him. It further in a way is also claimed by the Attorney General, especially by referring to and quoting at length from the dissenting opinions in the cases of State v. Start [65 Or. 178, 132 P. 512, 46 L.R.A. (N.S.) 266] and State v. McAllister [67 Or. 480,136 P. 354], infra, that the testimony was admissible, not to show that the criminal acts charged in the information *Page 43 
were committed by the defendant, but with what motive or intent they were committed. We think both theories untenable. On the theory of showing an admission or some statement by the defendant in the nature of an admission, we think the district attorney went beyond legitimate bounds for such purpose and was permitted in detail to descend to proof of acts and conduct of the defendant quite to the extent as though such acts had constituted a charged offense and about as fully as the acts of the charged offense themselves were gone into. In other words, the district attorney was permitted to prove about all the essentials of an offense or of an attempted offense similar to that charged in the information. All that is now claimed to have been admissible to show what statement concerning Edwards the defendant had made to the witness. The testimony of the witness in such particular is no broader or more effectual than was finally stated by him on his redirect examination when he was specifically asked by the district attorney to state just what in such respect was stated by the defendant, to which the witness answered that what the defendant said was "Thomas had been up there," in the defendant's room, "and seen him," and that by "Thomas" was meant Thomas Edwards. Such statement readily could have been elicited without the state being permitted to show the circumstances under which the witness met the defendant at or near the park, the circumstances of the defendant inviting him to the defendant's room and after entering it locking the door and "loving and kissing" the witness and taking down his pants; the witness pushing the defendant away and making "demands" on him, and permitting the witness to describe all that took place in such particulars. And the question asked the witness by the district attorney whether the defendant paid him any money and the witness answering in the affirmative, though the question and answer were stricken, yet clearly indicate that the primary purpose of eliciting the testimony of the witness was to show the commission or attempted commission of an offense *Page 44 
similar to that charged in the information. Such purpose, too, is emphasized by the district attorney directly asking the witness what the defendant did and what the witness did and the witness relating what each did.
But it is urged that proof of the mere statement of the defendant that Thomas had been in the defendant's room to see him, which undoubtedly was admissible, would not show or tend to show an admission that the defendant had committed the charged offense. So it would not. There is the rub. But since the admissible competent evidence did not show what was desired, it did not justify a resort of inadmissible evidence. Thus the notion was conceived that if the prosecution be permitted to show all the circumstances of the so-called corroborating witness visiting the defendant and the details of the defendant's acts and conduct in either committing or attempting to commit an offense with the witness similar to that charged in the information, and too in manner as it was testified to the charged offense was committed, an inference could be indulged or deduced that Edwards not only visited the defendant for the same purpose, but also that the defendant committed the charged offense as testified to by Edwards. That but leads to the conclusion that when an opportunity is shown to have committed the charged offense, then evidence may be adduced to show the commission or attempted commission of a similar offense upon one other than the person charged in the information. Equally fallacious is it to urge that the circumstances and details of the commission or the attempted commission of the offense by the defendant on the so-called corroborating witness was admissible to characterize or explain the statement made by the defendant that Edwards had been to his room to see him. That but involves the same proposition that evidence of the commission or attempted commission of a similar offense is admissible to explain or characterize the purpose of the visit of Edwards, and again to indulge the inference that inasmuch as the defendant committed or attempted to commit an offense on *Page 45 
the body of the so-called corroborating witness, it therefore follows or is inferable that he committed the charged offense on the body of Edwards because he had been in the defendant's room to see him. If, on such pretense, the familiar and general rule that evidence of a separate though similar offense is not admissible against the accused on trial for another and specific offense to show a probability that he committed the charged offense is to be disregarded, then as well may the rule itself be abrogated.
This brings us to the other suggested theory that the testimony was admissible to show intent or motive. In the case ofState v. Bowen, 43 Utah 111, 134 P. 623, 624, the rule is stated that: "As a general rule, evidence of separate and similar offenses is not admissible against the accused on trial for another specific offense. There are some 5 exceptions: Where it is material or proper to show motive, or a general scheme or plan, for the commission of the alleged specific offense; where criminal intent, or guilty knowledge of wrongful or unlawful acts or conduct with respect to matters involved in the charge, are material, frequently applied in cases of uttering forged instruments, counterfeit coin or money, receiving stolen goods, and others, where guilty knowledge or criminal intent as to particular acts or conduct are material subjects of inquiry; and where the alleged offense and other claimed similar or separate offenses constitute parts of one transaction, or of a general scheme or plan, and are so related and connected that a complete account of the entire transaction of the one cannot fairly be given without also showing the other, or where the proof of the one necessarily involves proving the other." Cases are there cited supporting such rule. Several cases, State v. McAllister, 67 Or. 480, 136 P. 354, 356;State v. Start, 65 Or. 178, 132 P. 512, 46 L.R.A. (N.S.) 266, are cited by the appellant which are directly in point. In the first cited case the court said:
"On the trial, in the court below, several witnesses were permitted, over the objections of the defendant, to give evidence tending to *Page 46 
prove that the defendant had committed, with persons other than the person named in the indictment, the crime against nature. The case of State v. Start [65 Or. 178], 132 P. 512 [46 L.R.A. (N.S.) 266], is a case in which the defendant was charged with the crime against nature, committed with another man. In that case the trial court had permitted to be given in evidence testimony, tending to prove that the defendant had committed the crime against nature with other persons. It was held in that case, by a majority of the court, that such evidence was not admissible."
No cases are cited by the respondent to the contrary. The reasons for the rule are well stated in 8 R.C.L. 198 and 199. They may there be read.
It, however, is urged that the admissibility of the evidence comes within the exception to the general rule to show motive or intent. That is well answered in 8 R.C.L. 206, where it is said:
"Where from the nature of the offense under inquiry, proof of its commission as charged carries with it the evident implication of a criminal intent, evidence of the perpetration, or attempted perpetration, of other like offenses will not be admitted."
So, too, in 8 R.C.L. 201, where it is said:
"Whenever mental state, scienter, or quo animo constitutes an ingredient of the offense charged, evidence is admissible of acts, conduct or declarations of the accused which tend to establish such knowledge, intention, or motive notwithstanding the fact that it may disclose a different crime in law."
We think the proposition also answered in the Bowen Case, supra, where it is said:
"Of course larceny involves a criminal intent — a felonious taking to deprive the owner of his property — as do many other crimes. But, if A. is charged with murder of B., it would not be competent, in the absence of proof of a general plan or scheme or that the offenses were parts of one entire transaction, to show the murder of C. by A. to prove a malicious intent to kill B. or to disprove a claimed accidental or justifiable killing. Nor, in the absence of such exceptions, would it be competent to show that A. Feloniously took C.'s cow to prove that he feloniously took B.'s or to disprove a claimed innocent taking. To bring it within the rule it should be made to appear that *Page 47 
the motive, the intent which inspired or prompted the felonious taking of the one, also inspired or prompted the taking of the other, and that the two were so related and connected as to be parts of one transaction."
To the same effect are 16 C.J. 586-589; Jones on Evidence (2d Ed.) § 143; notes to the case of People v. Molineux, reported in 62 L.R.A. 193; notes to the case of Sykes v. State, 105 Am. St. Rep. 995; and State v. Spray, 174 Mo. 569,74 S.W. 846.
It is quite evident that the case is not within the rule where mental state, or scienter, or quo animo, or with what intent or motive the defendant committed the alleged criminal acts or the charged offense, is in any degree involved. Nor is it made to appear that the criminal acts charged and those testified to by the corroborating witness were acts of one transaction or so related and connected as to be parts of one transaction. Quite the contrary is shown. To here say the evidence was admissible to show motive or intent to commit or the probability of having committed the charged offense, it may as well be urged that to show with what motive, or intent, or scienter, or quo animo, the accused committed a charged offense of adultery with a particular woman or a probability of having committed it, it would be admissible to show that he, on another or other occasions, committed or attempted to commit adultery with another woman or divers other women.
While we think it was admissible to show statements of the defendant that Edwards had visited him or had been to see him in his room, yet, for the reasons stated, we think it was inadmissible to give proof as to the manner in which the defendant met and accosted or invited the so-called corroborating witness to his room, and of the acts and conduct of the defendant after they entered the room tending to show the commission or attempted commission of an offense with the witness, all of which was unnecessary in order to show the statement of the defendant that Thomas, *Page 48 
thereby meaning Edwards, had been to his room to see him. The case in such respect is not, as is urged, within the rule stated in 16 C.J. 638, that:
"An admission of accused relevant to the crime for which he is on trial is not to be excluded because it involves an admission or confession of another crime, where the two are inseparably connected that one cannot be shown without also showing the other. Evidence that accused has admitted the commission of other crimes is also competent, where the fact of their commission is relevant, as for the purpose of showing guilty knowledge or intent, etc., but not otherwise."
The case here is not such where the two offenses were so "inseparably connected that one cannot be shown without also showing the other." That the two offenses here were separate and distinct transactions is indisputably shown by the record. And further the statement made by the defendant 6 that Edwards had been to his room to see him did not constitute an "admission" of guilt of the charged offense or of having had improper relations with Edwards. The only relevancy of the statement is to show an association between Edwards and the defendant and no opportunity to have committed the offense, but not to lay a foundation to admit evidence of a wholly separate and distinct offense or attempted offense. The authorities and cases heretofore cited and notes to them we think clearly so show.
The defendant not only objected to the conversation the witness had with the defendant, but also specifically objected to all of the other matters sought to be and which were elicited. That the ruling admitting the inadmissible matter was harmful, we think admits of no controversy. Because of 7 the atrocious and heinous character of the charged offense, we think more prejudice resulted from the erroneous ruling than otherwise might result in a case of a charged offense not so vile or detestable. Whether the testimony of the witness Edwards did or did not require corroboration to convict, or whether the testimony *Page 49 
complained of was or was not sought for such purpose, the ruling admitting the objectionable evidence, whether for such purpose or otherwise, was equally erroneous and prejudicial. The fact that counsel for the defendant cross-examined the witness as to such testimony, in no sense, as in some particulars is indicated, waived the objections made to such direct testimony or rendered the objectionable testimony admissible.
We thus are of the opinion that the judgment should be reversed, and the cause remanded for a new trial.
ELIAS HANSEN and EPHRAIM HANSON, JJ., concur.