[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1308 
Theft of services, second degree; fifteen years sentence (habitual offender).
The appellant was charged with theft under the following indictment which, omitting the formal parts reads:
 "The Grand Jury of said County charge that before the finding of this Indictment Ronnie Johnson did, between October 15, 1980 and February 11, 1981 intentionally and by deception, threat, false token or other means to avoid payment for said services, obtain from South Central Bell Telephone Company services to-wit, a series of long distance telephone calls, of the value of more than one hundred and no/100 ($100.00) dollars, known by him to be available only for compensation, in violation of § 13A-8-10.2 Code of the Code of Alabama 1975, as amended."
The State alleged that appellant intentionally obtained telephone services by calling from one telephone and charging the calls to another number listed under the name of Bobby Graham.
Bobby Graham and the appellant had been friends for "quite a few years." Graham testified that during the month of September, 1980, he gave the appellant permission to charge long-distance telephone calls to his (Graham's) home telephone. According to Graham, the appellant assured him that he would pay for the calls, but when the October billing for the long-distance calls was received, the appellant avoided payment by stating that he was unable to pay. Graham said that on several occasions in November he requested payment from the appellant, but he received only excuses from the appellant for nonpayment. Graham also testified that the appellant told him that the long-distance calls were made to the appellant's girlfriend, Michele Marinko, who lived with her parents in Kansas.
Graham stated that on November 16, 1980, he told the appellant not to charge any more calls to his (Graham's) home telephone. According to Graham, however, the calls continued, and in December, 1980, when Graham received his telephone bill, he again asked the appellant for payment.
During cross-examination, Graham admitted that the appellant had given him approximately sixty-seven dollars for calls made with Graham's permission in September of 1980. Graham testified that South Central Bell was still billing him for the long-distance charges on the calls made by the appellant in November and December, *Page 1309 
and during the trial, he identified the phone bills he had received.
Mrs. Carol Adams, the residence department supervisor with South Central Bell in Phenix City testified that the approximate amount due as a result of the long-distance calls charged to Mr. Graham's phone was $300.
Sandra Long Graham, the wife of Bobby Graham, testified that sometime after January 16, 1981, she and her husband had a conversation with the appellant. At that time, the appellant admitted making the phone calls, stating that the reason he made them was because "I needed to talk to my girl friend [sic]."
At the end of the State's case, the appellant made a motion to exclude the State's evidence, which the trial court overruled. The appellant did not present any evidence in his behalf.
 I
The appellant contends that the State failed to prove each and every element of the offense of theft of services in the second degree. He argues that the State failed to prove that South Central Bell Telephone Company performed any service in connection with any of the alleged unauthorized telephone calls. Further, he maintains that the State failed to show either the value of the services performed by South Central Bell Telephone Company, or that he was the one who made the telephone calls which were billed to Mr. Graham's home telephone. The appellant also insists that the State's proof of his girlfriend's residence, by a business record of the Alabama Power Company and by a returned postage receipt to one of the State's investigators, was hearsay and improperly admitted.
The appellant was charged with theft of services under §13A-8-10, Code of Alabama 1975, and the foregoing indictment tracks this statute. Section 13A-8-10 (a)(1) provides:
 "A person commits the crime of theft of services if: (1) He intentionally obtains services known by him to be available only for compensation by deception, threat, false token or other means to avoid payment for the services. . . ."
Section 13A-8-10 (b) designates "telephone services" as one of the services subject to theft under the statute, and § 13A-8-1
(10) indicates that "the supplying of . . . a [public utility] commodity to premises from an outside source by means of wires, pipes, conduits or other equipment shall be deemed a rendition of a service. . . ." Thus, there is no question that the legislature intended to prohibit theft of services rendered by a telephone company. The appellant argues, however, that because the telephone calls were interstate and were made by using the lines of various subsidiaries of AT T other than South Central Bell, South Central Bell itself rendered no service in connection with the calls.
While we recognize that certain long-distance telephone calls, such as the ones at issue here, may not involve the actual physical use of South Central Bell's lines, we cannot say that these calls do not represent a "service" rendered by South Central Bell. Although there is no definition of "telephone service" in the criminal code, the legislature has defined the term in § 37-6-40 (1), Code of Alabama 1975, as follows:
 "Any communication service, including all telephone lines, facilities or systems used in the rendition of such service." [Emphasis added]
In our judgment, interstate calls originating from or charged to a Russell County number but actually transmitted over other telephone companies' lines, involve a "service" rendered by South Central Bell to the *Page 1310 
Russell County subscriber. The service performed is simply the extension of credit: (1) the subscriber is entitled to make a telephone call to anywhere in the world from his own number and "charge it" without paying cash; (2) the subscriber is entitled to make a call from anywhere in the world and have it billed to his own number without paying cash; (3) the subscriber receives only one bill, and that is from South Central Bell. Regardless of how many other telephone companies' lines were used for his calls, and no matter which company owned the equipment through which his calls passed, the Russell County subscriber is not responsible for paying any entity other than South Central Bell.
All of the foregoing result in ease of communication and convenience for the subscriber, and they are part of the "service" rendered by South Central Bell to its subscribers. South Central Bell is thus analogous to the issuer of a credit card. The telephone company extends credit to its subscribers in much the same way as the card issuer does for its cardholders. In the present case, when South Central Bell was asked to bill a Russell County subscriber for charges on long-distance calls to Salina, Kansas, it was, through its billing function, furthering the telephone or communications service.
The value of the services was shown by the testimony of South Central Bell's subscriber, Bobby Graham, and by the phone bill which amounted to three-hundred dollars and sixty-seven cents. Our examination of that bill indicates that approximately twenty telephone calls were made to Salina, Kansas from Phenix City between December 15, 1980 and January 4, 1981, all after the date Graham instructed the appellant not to charge other long-distance calls to his (Graham's) home telephone. The South Central Bell bill dated January 16, 1981, alone indicated a total of long-distance calls of some one-hundred and twenty-six dollars and ninety-seven cents, and of the total calls, only six were made to a location other than Salina, Kansas. Further, the approximately twenty-two telephone calls made to Salina, Kansas as shown on the bill dated January 16, 1981, reflected a cost in excess of one-hundred dollars. In our judgment, therefore, the value of the service rendered was properly in evidence.
In the present case, the criminal conduct that the statute seeks to condemn grows out of the misrepresentation of the accused's relationship with the South Central Bell Telephone Company. The analogy may be made again to the credit card operations. The criminality of the unauthorized use of a credit card by a third party is in the misrepresentation by the third party that he has a contractual relationship with the issuer of the credit card. The card issuer then stands behind the authorized card user. The unauthorized use of the card by a third person results in the misrepresentation of the present existing fact (that he is authorized to sign the card) upon which another relies to his detriment. See Stokes v. State,366 P.2d 425 (Okla.Cr.App. 1961). Here, appellant misrepresented to South Central Bell that he was authorized to charge calls to Mr. Graham's number.
Since Graham, his wife, or someone to whom he gave permission had authority to charge calls, the jury could find that the South Central Bell Telephone Company relied upon the appellant's misrepresentation when it permitted the long-distance calls to be charged to Graham's home telephone.
The appellant's intent is evidenced from the uncontroverted testimony of Graham who testified that, after he informed the appellant not to charge any other long-distance calls to his home telephone, Graham received bills for more long-distance calls amounting to one-hundred and twenty-six dollars and ninety-seven cents on his January, 16, 1981 telephone bill.
Further, the testimony was uncontroverted that the appellant told Graham the calls *Page 1311 
were made to his girlfriend, Michele Marinko, who had gone back to live with her family in Kansas. It was also undisputed that appellant admitted to Mrs. Graham after January 16, 1981, that he made the long-distance telephone calls and said "I needed to talk to my girlfriend."
Appellant complains of error in the admission of evidence presented by the State, through an Alabama Power Company employee who had custody of the records, that the appellant's girlfriend, Michele Marinko, or someone purporting to be her, had executed a card requesting service from the Alabama Power Company. The card showed that Michele Marinko's father lived in Salina, Kansas. In brief, the appellant maintains that the admission of the Power Company security deposit card was hearsay. However, at trial the appellant objected to the admission of the card because it was not "relative to the issues in the case. Ms. Marinko is not on trial."
The trial court cannot be placed in error on grounds not asserted. Hargrove v. State, 344 So.2d 823 (Ala.Cr.App.), cert. denied, 344 So.2d 826 (Ala. 1977). The court was required to pass only upon the ground of the objection specified by the appellant and those not announced are waived. Rogers v. State,53 Ala. App. 573, 302 So.2d 547 (1974). Thus, the appellant failed to preserve this matter for appellate review. Hargrovev. State, supra.
There was also evidence presented by the State, through an investigator with the Russell County District Attorney's office, that a subpoena was mailed to Michele Marinko with a return receipt requested. The United states postal return receipt, which was identified and allowed into evidence, showed Ms. Marinko's signature and her address as 1430 Pawnee Drive, Salina, Kansas. The postal return receipt is admissible as an exception to the hearsay rule allowing a statement that is useful to identify a person, time, place or other thing. C. Gamble, McElroy's Alabama Evidence § 273.01 (3d ed. 1977). Although the postal return receipt cannot be considered evidence of the truth of the fact that a subpoena was sent to Michele Marinko, it may be used for the limited purpose of identifying the place where the letter containing the subpoena addressed to her was sent. See Gamble, supra.
The evidence presented by the State was sufficient to prove that the appellant was guilty of the offense of theft of services. The sufficiency of this proof, viewed in the light most favorable to the State, was such that a jury could properly find beyond a reasonable doubt that the defendant was guilty of the crime charged.
 II
The appellant contends that the trial court committed reversible error when it did not instruct the jury concerning certain circumstantial evidence.
The record indicates that at the end of the court's instructions to the jury the State announced that it was satisfied with the court's instructions and the jury was excused to begin their deliberations in the case.
The appellant did not request a written instruction on circumstantial evidence but he made an oral request out of the presence of the jury after the jury had retired to deliberate. The exceptions to an oral charge must be made in the presence of the jury and prior to their retirement for deliberations.Van Antwerp v. State, 358 So.2d 782 (Ala.Cr.App. 1978).
Our examination of the record shows that after the State announced "satisfied," an off-the-record bench conference occurred. Whether at that time the appellant was given permission to make his exceptions out of the presence of the jury is not indicated by this record. In the absence *Page 1312 
of a timely objection to the court's oral instructions in the jury's presence this court had nothing to review. Cox v. State,280 Ala. 318, 193 So.2d 759 (1967).
 III
The appellant complains that he was improperly sentenced under the Habitual Felony Offender Act because, for the nine prior forgery convictions used to enhance his punishment, he had been given a certificate granting restoration of his civil and political rights by the State Board of Pardons and Paroles. He maintains that this certificate constituted a pardon under §15-22-36, Code of Alabama 1975 as amended, and it was error to use these convictions to enhance punishment.
The certificate, a copy of which appears in the record, does not state that the appellant was pardoned for the nine convictions, merely that the State Board of Pardons and Paroles had restored to him his civil and political rights.
Although we recognize that the State Pardon and Paroles Board does have the authority to grant a pardon under § 15-22-36, supra, the certificate appearing in the record is not a pardon. Moreover, even if it were a full pardon it would not, in our judgment, preclude those convictions from being used to enhance appellant's punishment. See Mason v. State, 39 Ala. App. 1,103 So.2d 337 (1956), affirmed, 267 Ala. 507, 103 So.2d 341 (1958). In Mason, the sole question raised was whether the appellant's possession of a pistol, after conviction for a crime of violence was illegal in view of the pardon that Mason had been granted. The court observed that the question of a pardon's effect had been reviewed in cases dealing with punishment imposed under multiple offender statutes. The court citedPeoples v. Biggs, 9 Cal.2d 508, 71 P.2d 214, 116 A.L.R. 205, and quoted the following excerpts:
 "`It is universally established that a pardon exempts the individual from the punishment which the law inflicts for the crime which he has committed; and generally speaking, it also removes any disqualifications or disabilities which would ordinarily have followed from the conviction. To say, however, that the offender is a `new man,' and as `innocent as if he had never committed the offense,' is to ignore the difference between the crime and the criminal. A person adjudged guilty of an offense is a convicted criminal, though pardoned; he may be deserving of punishment, though left unpunished; and the law may regard him as more dangerous to society than one never found guilty of crime, though it place no restraints upon him following his conviction. The criminal character or habits of the individual, the chief postulate of habitual criminal statutes, is often as clearly disclosed by a pardoned conviction as by one never condoned. . . .
. . . .
 "`With respect to the precise question before us, namely, the effect of a prior conviction which has been pardoned, the courts are in conflict; but perhaps the weight of authority, and certainly of critical opinion, is to the effect that the pardon is immaterial, and that the defendant may be adjudged a prior offender and given the increased punishment as such. See People v. Carlesi, 154 App. Div. 481, 139 N.Y.S. 309, affirmed 208 N.Y. 547, 101 N.E. 1114; Id., 233 U.S. 51, 34 S.Ct. 576, 58 L.Ed. 843; People v. Murphy, 244 App. Div. 834, 279 N.Y.S. 762; Mount v. Commonwealth, 2 Duv. 93, 63 Ky. 93; Herndon v. Commonwealth, 105 Ky. 197, 48 S.W. 989, 88 Am.St.Rep. 303; State v. Edelstein, 146 Wn. 221, 262 P. 622; 16 C.J. 1342, § 3157; notes, 58 A.L.R. 20, 49; 13 Columb.L.Rev. 418; 14 Minn.L.Rev. 293; 78 U.Pa.L.Rev. 561; 28 Harv.L.Rev. 647, 655; 41 Harv.L.Rev. 918; 5 Fordham L.Rev. 166; 3 So.Cal.L. Rev. 438; 22 Journ.Crim.Law 122. As the court states in People v. Carlesi, supra, 154 App. Div. 481, 139 N.Y.S. 309, 312: "The pardon of this defendant did *Page 1313 
not `make a new man' of him. It did not `blot out' the fact or the record of his conviction. * * * The pardon in this case merely restored the defendant to his civil rights. If it had been granted before his term of imprisonment had been served, it would also have relieved the defendant of that. But it did not obliterate the record of his conviction or blot out the fact that he had been convicted. * * * It relieved the defendant of the consequences which the law attached to his offense. But the defendant is to be punished now solely in consequence of his second offense."
. . . .
 "`The other view, holding that the pardoned offense cannot be considered, is based upon the literal application of the theory that the pardon `blots out guilt,' and `wipes out the offense,' which is then regarded as never having been committed. See Edwards v. Commonwealth, 78 Va. 39, 49 Am.Rep. 377; State v. Martin, 59 Ohio St. 212, 52 N.E. 188, 43 L.R.A. 94, 69 Am.St.Rep. 762; Tucker v. State, 14 Okla. Cr. 54, 167 P. 637; State v. Lee, 171 La. 733, 132 So. 219; Scrivnor v. State, 113 Tex.Crim. R., 20 S.W.2d 416."'
Judge Harwood, writing for the court in Mason, noted that "[a] pardon cannot wipe out the historical fact of the conviction, and as appropriately stated by one court, it involves forgiveness and not forgetfulness." Mason v. State,39 Ala. App. at 4-5, 103 So.2d at 341. Based on the authority cited in Mason, which holds that prior convictions can be used for enhancement purposes, it would follow that if a pardon did not "blot out" the record of a defendant's conviction, then certainly a certificate merely restoring the appellant's civil and political rights would also not erase the conviction. Therefore we hold that a conviction can be used to enhance punishment under the Alabama Habitual Felony Offender Act, §13A-5-9, Code of Alabama 1975, notwithstanding the fact that the offender has been restored to his civil and political rights.
Based on the foregoing, it is our judgment that the trial court properly considered the appellant's nine prior convictions for first degree forgery for enhancement purposes under the Alabama Habitual Felony Offender Act, supra. There being no error in the record, the judgment of conviction by the Russell Circuit Court is affirmed.
AFFIRMED.
All the Judges concur.
 ON REHEARING
We have extended the opinion in this case in order to clarify a question not addressed in our original opinion.
The record reveals that on September 1, 1981, appellant was sentenced by the trial court to a term of five years. Then, in response to a motion filed by the State on September 29, 1981, to reconsider the sentence in light of the Habitual Felony Offender Act as it had been construed in Watson v. State,392 So.2d 1274 (Ala.Cr.App. 1980), cert. denied, 392 So.2d 1280
(Ala. 1981), the appellant was sentenced to fifteen years. The court conducted the second sentencing "in accordance with the mandate of Watson v. State," finding that appellant's nine prior forgery offenses should count as nine, rather than as one previous conviction for purposes of sentencing.
Appellant argues that once he filed his notice of appeal following imposition of the first sentence, the trial court lost all jurisdiction over the case and had no authority to re-sentence him twenty-eight days later.
Under former law, the trial court retained jurisdiction over a cause for a period of thirty days following judgment and had the power to alter or modify its decree within that period. Ala. Code Tit. 13, § 119 (1940); Essex v. State, 45 Ala. App. 141, 227 So.2d 138 (1969). Title 13, § 119, however, was superseded as to civil cases in 1977 by Rules 59, 60 and 62 of the Alabama Rules of Civil Procedure. See A.R.C.P. Appendix II. *Page 1314 
See also A.R.A.P. 4 (Court Comments Applicable to the [June 6, 1978] Amendment to Rule 4 (b)).
Furthermore, the 1975 Code does not contain a section corresponding to T. 13, § 119, and the statute was therefore repealed by virtue of § 1-1-10 of the Code of Alabama 1975. The latter section provides, in pertinent part, the following:
 "Subject to the provisions of this Section, or as may be otherwise provided in this Code, all statutes of a public, general and permanent nature, not included in this Code, are repealed. . . ."
Under present law, then, the trial judge does not retain jurisdiction over a case for all purposes under the "thirty-day rule," which we hold is no longer the law in Alabama. The court retains jurisdiction for the following limited purposes pursuant to § 12-22-133 of the Code of Alabama 1975:
 "Where an appeal is taken from the judgment of any municipal, district or circuit court in criminal cases, the trial court retains jurisdiction for the purpose of granting a motion for new trial and also retains jurisdiction for the purpose of enforcing its judgment where the appeal is dismissed before the judgment of the appellate court is entered."
[Emphasis added]
Implicit in the wording of the appellate rules is the fact that the trial court also retains jurisdiction over a criminal case, even though notice of appeal has been filed, until the pronouncement of sentence. See A.R.A.P. 4 (b) ("A notice of appeal filed after the announcement of a decision or order, but before pronouncement of the sentence, shall be treated as having been filed after pronouncement of the sentence and on the day thereof.")
The term "sentence," of course, assumes a valid statutorily-imposed punishment. Appellant's first sentence, which was not in accord with the mandatory provisions of the Habitual Felony Offender Act, was invalid. The trial court had not only the power but the duty to sentence appellant as required by law. See Bozza v. United States, 330 U.S. 160,67 S.Ct. 645, 91 L.Ed. 818 (1947); In re Bonner, 151 U.S. 242,14 S.Ct. 323, 38 L.Ed. 149 (1894); Thompson v. United States,495 F.2d 1304 (1st Cir. 1974); Garcia v. United States,492 F.2d 395 (10th Cir. 1974); Caille v. United States,487 F.2d 614 (5th Cir. 1973). As the Court of Appeals for the First Circuit observed in Thompson v. United States:
 "The full import of Bozza [v. United States] is that a trial court not only can alter a statutorily-invalid sentence in a way which might increase its severity, but must do so when the statute so provides." 495 F.2d at 1306 [Emphasis in original]
Accordingly, we find no error in the trial court's vacating appellant's original punishment and re-sentencing him according to law.
OPINION EXTENDED; APPLICATION OVERRULED
All the Judges concur.